UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SCOTT B. OBERMOELLER,              )
                                   )
                    Plaintiff,     )
                                   )
          v.                       )    No.  4:07CV1222 DJS
                                   )                  (FRB)
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
                    Defendant.     )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse ruling by the Social Security Administration.  All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

On February 3, 2005, plaintiff Scott Obermoeller filed an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.; and an application for Disability Insurance Benefits (DIB) pursuant to Title II, 42 U.S.C. §§ 401, et seq., in which he claimed that he became disabled and unable to work on November 1, 2003.  (Tr. 68-70, 123-27.)  On initial consideration, the Social Security Administration denied plaintiff's applications for benefits.  (Tr. 59-63, 67, 78, 113-17.)  On November 8, 2006, a hearing was held before an Administrative Law Judge (ALJ).  (Tr. 27-47.)  Plaintiff testified and was represented by counsel.  A vocational expert also

testified at the hearing.  On January 20, 2007, the ALJ issued a decision denying plaintiff's applications for benefits.  (Tr. 8-26.)  On April 30, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 2-4.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on November 8, 2006, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-three years of age.  Plaintiff is a high school graduate and attended some college.  (Tr. 29-30.)  Plaintiff cares for his thirteen-year-old son.  (Tr. 32.)

From 1988 to 1989, plaintiff worked as a delivery driver for a pizza restaurant.  For a few months in 1990, plaintiff worked as a machine operator in missile production.  For a one-month period in 1990, plaintiff worked as a foreman at a packaging company.  For a few months in 1991, plaintiff worked as an assembler in satellite motor manufacturing.  From 1991 to 1992, plaintiff worked as a manager at a packaging company.  For a few months in 1993, plaintiff worked as waiter.  From 1993 through 1998, plaintiff worked as a dealer at a casino.  (Tr. 141.)  Plaintiff testified that his employment at the casino was terminated because of his diabetes and low blood sugar levels while dealing.  (Tr. 30.)  In 1995 and from 2001 through November 2003,

- 2 -

plaintiff was self-employed as a landscaper and painter. (Tr. 141.) Plaintiff testified that his landscaping work was seasonal, occurring from mid-March through the end of November. Plaintiff testified that he occasionally painted through the winter. (Tr. 31.)

Plaintiff testified that he continued to receive earnings in 2004 and 2005. Plaintiff testified that he did no actual work for these earnings but that a friend continued in the landscaping business and continued to pay plaintiff to try to help him. (Tr. 37.) Plaintiff testified that he subsequently lost the landscaping account because his friend did not perform well with the job. (Tr. 38.)

Plaintiff testified that he is unable to work because of neuropathy in his legs and hands. Plaintiff testified that he has no strength or feeling. (Tr. 32.) Plaintiff testified that he has been insulin-dependent with his diabetes for thirty-four years and that he has experienced complications with this disease for years. (Tr. 33.) Plaintiff testified that his diabetes also causes him to have a poor memory because of low blood sugar. Plaintiff testified that his memory problems have worsened during the previous one to two years. (Tr. 42.) Plaintiff testified that he slips out of consciousness when his blood sugar is low, but that he does not feel it coming on. Plaintiff testified that he usually experiences such episodes twice a year, but that the frequency of such episodes has recently increased due to increased stress. (Tr. 43.)

Plaintiff testified that he also has problems with his

back with degenerating discs and an underdeveloped spine. Plaintiff testified that he was told that nothing could be done for his back. (Tr. 33.) Plaintiff testified that he experiences constant pain in the low to mid-part of his back and that the pain becomes severe at times. (Tr. 33-34.) Plaintiff testified that he feels the pain spread and it becomes a very intense, burning feeling. (Tr. 34.) Plaintiff testified that he can stand for up to fifteen minutes before he experiences problems with his back. (Tr. 40.) Plaintiff testified that he has difficulty sitting because of the pain in his back and that he must get up or move around after sitting for ten to fifteen minutes. (Tr. 36, 40.)

Plaintiff testified that he had shoulder surgery in 2004 and never regained the full use of his right arm because of his inability to participate in therapy. Plaintiff testified that he has difficulty throwing and lifting with the arm. Plaintiff testified that he thought he could lift up to thirty pounds with his right arm if it was positioned close to his body, but that he could not lift a gallon of milk if his arm was extended. (Tr. 39.)

Plaintiff testified that he also suffers from depression and first sought treatment for the condition two years prior. (Tr. 34.) Plaintiff testified that he takes Paxil for the condition. Plaintiff testified that his depression causes him not to want to do anything, and that he has a fear of leaving his home because of complications with diabetes. (Tr. 35.)

Plaintiff testified that he has undergone testing in relation to vascular disease, and that he has pain and no strength

on account of the disease.  Plaintiff testified that his lack of strength requires him to sit after walking about twenty-five feet.  (Tr. 35-36.)  Plaintiff testified that he can stoop and bend with his legs, but with stiffness.  (Tr. 40.)  Plaintiff testified that he also has no feeling in his hands and that he cannot manipulate small things because of it.  Plaintiff testified that he drops things on account of the condition.  (Tr. 36-37.)  Plaintiff testified that he has a computer at home, but that he cannot type because of the feeling in his fingers.  Plaintiff testified that his son primarily uses the computer for school.  (Tr. 37.)

Plaintiff testified that the medication he takes for his depression is also used for his pain and neuropathy.  Plaintiff testified that moving around seems to help his pain.  Plaintiff testified that he smokes two packs of cigarettes a day, and that he has tried to stop smoking on the advice of his vascular physician but with no success.  (Tr. 41.)

B.  <u>Testimony of Vocational Expert</u>

Gary Weimholt, a vocational expert, testified at the hearing.  The ALJ asked Mr. Weimholt to assume an individual forty years of age,

> with 14 years of education [who] can lift and carry up to 20 pounds occasionally, ten frequently, sit for six hours out of eight, stand or walk for six hours out of eight, can occasionally climb stairs and ramps, never ropes, ladders and scaffolds and pushing and pulling with both the legs and the arms are limited to those weights of 20/10 with no repetitive bilaterally and he should avoid concentrated exposure to the hazards of moving and dangerous machinery, unprotected heights.

In addition, he is able to understand, remember and carry out at least simple instructions and nondetailed tasks, maintain concentration and attention for two hour segments over an eight hour period, can respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent and can adapt to routine, simple work changes and take appropriate precautions to avoid hazards.

(Tr. 44-45.)

Mr. Weimholt testified that such a person could not perform plaintiff's past relevant work, including as a gambling dealer. Mr. Weimholt testified, however, that such a person could perform simple cashiering-II jobs (code 211.462-010) at the light level of exertion, and that 2500 such jobs exist in the state economy with 125,000 existing nationally. Mr. Weimholt also testified that such a person could perform some light inspection hand packaging jobs (code 559.687-074), and that 1500 such jobs exist in the state economy with 75,000 existing nationally. (Tr. 45.)

The ALJ then asked Mr. Weimholt to assume a person with the same exertional limitations as the first hypothetical, and to also assume the person to be restricted as described in Dr. Khan's Residual Functional Capacity Assessment. Mr. Weimholt testified that such a person would not be able to perform work in the state or national economies. (Tr. 45-46.)

### III. Medical Records

Plaintiff visited Dr. Lyndon B. Gross at Orthopedic Sports Medicine on January 22, 2004, for a second opinion relating to a right shoulder injury he sustained eleven months prior.

Plaintiff reported that he was initially evaluated by Dr. Sigmund who thought he had a strained rotator cuff and that physical therapy was prescribed, which plaintiff did not attend. Dr. Gross noted plaintiff to complain of continued pain in the anterior aspect of the right shoulder which worsened with any lifting activity. Plaintiff reported experiencing no pain in the neck or radiating to his arm. Plaintiff also reported experiencing no numbness in his extremities. Dr. Gross noted plaintiff's medical history to be significant for insulin-dependent diabetes mellitus. Physical examination showed plaintiff to have limited range of motion of the right shoulder with pain. Plaintiff had full motor strength in the external rotors of the left shoulder, as well as with his deltoid, biceps, triceps, wrist extensors, finger flexors, and intrinsics of the left upper extremity. Plaintiff's motor strength was measured to be 4/5 in the external rotor of the right shoulder. Strength was measured to be 5/5 in the deltoid, biceps, triceps, wrist extensors, finger flexors, and intrinsics of the right upper extremity. Sensation in the median, ulnar and radial nerves was noted to be normal bilaterally. Upon review of x-rays of the right shoulder as well as an MRI of the shoulder dated July 2003, Dr. Gross diagnosed plaintiff with right shoulder rotator cuff tear. It was determined that plaintiff would undergo surgery for the condition. (Tr. 206-08.)

On February 3, 2004, plaintiff underwent right shoulder arthroscopy, arthroscopic subacromonial decompression, and arthroscopic rotator cuff repair. During follow up on February 16,

2004, plaintiff reported to Dr. Gross that he had problems getting to therapy and had not yet attended. Upon examination, Dr. Gross noted plaintiff's shoulder to be stiff. Dr. Gross instructed plaintiff to begin formal therapy and a therapist taught plaintiff some exercises he could perform on his own. Plaintiff was instructed to discontinue use of the sling and abduction pillow and was instructed to return in two weeks for follow up. (Tr. 202.)

On February 17, 2004, plaintiff visited Comtrea Community Treatment for an initial psychiatric evaluation. Plaintiff reported to Dr. David Krojanker that he had been feeling depressed on and off for several years and that he had taken Zoloft[1] while he participated in a study at Barnes Hospital which related to diabetes and depression. Plaintiff reported that he had become more depressed during the last several months. Plaintiff reported that he had been crying, had some negative thinking, had become withdrawn and was isolating himself, was having anhedonia, and had experienced appetite and sleep disturbance. Plaintiff denied any current suicidal or homicidal ideations. Plaintiff reported that he recently had shoulder surgery and was participating in physical therapy. Plaintiff requested anti-depressant medication to help him with his depression. Dr. Krojanker noted plaintiff's history of diabetes as well as plaintiff's three laser eye surgeries relating thereto. Plaintiff denied any other major medical illnesses. Plaintiff reported his current medications to be

_____

[1]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

Humalog Insulin and Ultralente Insulin, as well as Percocet,[2] Flexeril[3] and Vioxx[4] for his shoulder pain.  Mental status examination showed plaintiff to have good eye contact, with speech and motor activity observed to be within normal limits.  Plaintiff had coherent flow of thought, was calm and displayed no current agitation.  Plaintiff's mood and affect were noted to be depressed.  Dr. Krojanker noted plaintiff's insight to be questionable, and plaintiff's cognitive capacity appeared to be grossly intact except for some decrease in memory.  Concentration and attention span were noted to be good.  Upon conclusion of the evaluation, Dr. Krojanker diagnosed plaintiff with major depression, recurrent, and assigned a Global Assessment of Functioning (GAF) score of 55.[5]  Plaintiff was prescribed Wellbutrin.[6]  Dr. Krojanker recommended that

---

[2]Percocet is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1211 (55th ed. 2001).

[3]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  Physicians' Desk Reference 1929 (55th ed. 2001).

[4]Vioxx is indicated for the relief of signs and symptoms of osteoarthritis and for the management of acute pain.  Physicians' Desk Reference 2049-50 (55th ed. 2001).

[5]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/ illness."  A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

[6]Wellbutrin is indicated for the treatment of depression.  Physicians' Desk Reference 1485-86 (55th ed. 2001).

plaintiff see a counselor at Comtrea.  Plaintiff reported to Dr. Krojanker that he planned to see his diabetes physician, Dr. McGill, on a regular basis for management of his diabetes and his primary care physician, Dr. Paula Baker, for monitoring of his primary medical care.  Plaintiff was instructed to return for follow up in three weeks.  (Tr. 262-64.)

On April 5, 2004, plaintiff returned to Dr. Gross.  It was noted that plaintiff had been attending physical therapy. Plaintiff reported that he felt he had improved.  Physical examination showed improved range of motion.  Motor strength in the external rotator of the shoulder continued to be 4/5.  Dr. Gross noted plaintiff to continue to lack some motion.  Dr. Gross opined that plaintiff would benefit from an aggressive stretching program in addition to strengthening.  It was determined that the therapist would begin working with plaintiff on this program that same date, and plaintiff was instructed to return to Dr. Gross for further assessment in three weeks.  (Tr. 201.)

On March 1, 2005, plaintiff was discharged from Comtrea. It was noted that plaintiff had not appeared for two doctor's appointments.  (Tr. 261.)

On June 1, 2005, Dr. John E. Emmons, D.O., examined plaintiff for disability determinations.  Dr. Emmons noted plaintiff's complaints of diabetes mellitus, neuropathy in both legs, and recent dysesthesias and paresthesias in his hands. Plaintiff also reported that he had been diagnosed with degenerative disk disease and that he had three vertebrae which

were congenitally fused. Plaintiff's history of kidney disease was also noted. Plaintiff reported that he lost his health insurance four months prior. Plaintiff's medications were noted to include Humalog and Ultralente. Plaintiff reported that he previously took Wellbutrin until he lost his insurance. Physical examination showed plaintiff's feet to be cool to the touch. Peripheral pulses were +2/4 at the brachial, radial and popliteal, and +1/6 of the dorsalis pedis and tibialis posterior bilaterally. Grip strength and upper and lower extremity strength was noted to be +5/5 bilaterally. Tenderness on palpation and range of motion was noted about the right shoulder. Deep tendon reflexes were measured to be +2/4 at the triceps, brachioradialis and patella bilaterally, and +1/4 at the Achilles bilaterally. Decreased sensitivity to pinprick and proprioceptive sensation were noted in the forearms and especially in the fingers bilaterally. Reduction in sensitivity was noted to extend to the elbows. Vibratory sensation seemed essentially normal bilaterally, as well as sensitivity in the upper arms. Pinprick, proprioceptive and vibratory sensations were noted to be moderately diminished in the lower extremities bilaterally in the feet and lower legs, but appeared normal proximal to the knees. Plaintiff's gait was noted to be essentially normal but somewhat slow. Plaintiff was noted to have limited range of motion about the cervical and lumbar spine, as well as about the right shoulder. Range of motion of the left shoulder, wrists, knees, hips, and ankles was normal. Dr. Emmons noted plaintiff to shift positions every five to ten minutes while

seated due to apparent lumbar and/or lower extremity discomfort. Dr. Emmons diagnosed plaintiff with, <u>inter alia</u>, insulin dependent diabetes mellitus, diabetic polyneuropathy of both the upper and lower extremities, diabetic retinopathy by history, and degenerative disk disease by history. (Tr. 251-59.) In conclusion, Dr. Emmons summarized:

> I believe within a reasonable degree of medical certainty after review of the available records, today's interview and today's examination, that this gentleman is able to walk 150 to 200 feet before needing to stop and rest, that he is able to climb two flights of 10 steps each before stopping to rest and that he is able to stand in one place for 5 to 10 minutes before having to move because of lower extremity pain. I believe within a reasonable degree of medical certainty that he is able to sit in one place for 5 to 10 minutes before needing to change positions and that he is able to travel for up to 4 hours per day with appropriate rest breaks.

(Tr. 256.)

Plaintiff returned to Comtrea on September 14, 2005, for assessment relating to depression. Plaintiff reported that he had always been depressed but that it had worsened. Plaintiff reported having a depressed mood most of the day, lack of interest, isolation, weight loss, difficulty sleeping, psychomotor retardation, no energy, feelings of worthlessness, and inability to concentrate. Plaintiff reported having no current thoughts of suicide, but that he had thoughts of suicide the previous month with no plan. Plaintiff reported that he and his girlfriend broke up a year and a half ago and that he had been progressively getting

more depressed since that time. Mental status examination showed plaintiff's mood to be depressed with a flat affect. Therapist Peggy DeGroot noted plaintiff's thought processes to be blocking indecision, flight of ideas, fragmented speech, and pressured speech. Plaintiff's judgment, insight and memory were noted to be okay. Plaintiff's self-concept was noted to be poor. Ms. DeGroot noted that plaintiff had previously been a Comtrea client who dropped services after initial consultation with Dr. Krojanker. It was noted that plaintiff had previously been prescribed Wellbutrin but that he stopped such medication after one month. Plaintiff reported that he had previously participated in a depression and diabetes study through Barnes Hospital but that he stopped his participation because of medication side effects. Plaintiff's physical health history was noted to include diabetes, neuropathy and kidney problems. Upon conclusion of the assessment, Ms. DeGroot diagnosed plaintiff with major depression, recurrent, and assigned a GAF score of 53. It was recommended that plaintiff obtain a psychiatric appointment and request a counselor for further treatment. (Tr. 235-37.)

Plaintiff called Comtrea on October 17, 2005, and reported that he had been doing okay but that he was concerned because he was running out of insulin and it would cost $80.00 to have it refilled. Plaintiff reported that he had previously taken insulin at a cost less than $20.00. Plaintiff stated that he could not afford to see a doctor and requested referrals to free clinics. Therapist DeGroot provided plaintiff with referrals to free clinics

in the area.  (Tr. 234.)

Plaintiff called Comtrea again on October 19, 2005, and reported that he called St. Anthony's urgent care and was told that he would "have to pay and the waiting list for the free clinic is 2 months and he can't wait that long."  An appointment was made with Dr. Ahmed at Comtrea that same date with a note that he might be able to provide a prescription for insulin.  Plaintiff was encouraged to call the American Diabetes Association for referrals to emergency help.  (Tr. 233.)

On October 19, 2005, plaintiff underwent psychiatric evaluation at Comtrea with Dr. Malik Ahmed, a psychiatrist. Plaintiff reported to Dr. Ahmed that his depression started eight years prior when he began to alienate himself, isolate and withdraw.  Plaintiff reported that his depression worsened over the previous few years.  Plaintiff reported that he participated in a study at Barnes Hospital for depression and diabetes and that he was given Zoloft for the study.  Plaintiff reported that he felt that Zoloft helped his depression but that he suffered side effects, stopped taking the medication and stopped participation in the study.  Plaintiff also reported that he began seeing Dr. Krojanker at Comtrea in February and was given Wellbutrin. Plaintiff reported that he sensed no change after a month of the medication and that he could not afford to refill it, so he stopped taking it.  Plaintiff reported his current state of depression to be the worst he had ever felt and that he did not want to leave his home or participate in any activities of daily life.  Plaintiff

reported having poor short term memory and of having low energy. Plaintiff reported feelings of worthlessness and guilt and of feeling angry, irritable and on edge. Plaintiff denied any suicidal ideations or psychotic symptoms. It was noted that plaintiff had been diagnosed with diabetes at the age of nine and had neuropathy, kidney problems and three laser eye surgeries on account thereof. It was also noted that plaintiff experienced muscle weakness on account of the diabetes and recently had right rotator cuff surgery. Plaintiff's only current medication was noted to be insulin. Mental status examination showed plaintiff to be in severe distress. Plaintiff had poor intermittent eye contact and his speech was low and monotone. Plaintiff's psychomotor was noted to be retarded and his mood was depressed. Plaintiff's affect was flat. Memory and concentration were noted to be poor and insight and judgment were noted to be fair. Plaintiff's intellectual functioning was normal. Dr. Ahmed diagnosed plaintiff with major depressive disorder, recurrent, and assigned a GAF score of 50.[7] Dr. Ahmed prescribed Cymbalta for plaintiff to help him with his depression as well as with his pain related to diabetic neuropathy.[8] Dr. Ahmed instructed plaintiff to consider coming to

---

[7]A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

[8]Cymbalta is used to treat depression and generalized anxiety disorder as well as to treat pain and tingling caused by diabetic neuropathy. Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a604030.html>.

Comtrea for counseling. Plaintiff reported that he would see his diabetic specialist to get treatment for his diabetes and that he would visit Social Security to get his son back on Medicaid. Plaintiff was instructed to return in three weeks and to call if there were any problems. (Tr. 216-17.)

Plaintiff visited Comtrea on October 20, 2005, for counseling. Plaintiff reported some concerns in that he continued to isolate himself and felt guilty about not doing more things with his son. Plaintiff reported financial stressors and concerns with his deteriorating health due to diabetes. Plaintiff had no suicidal or homicidal ideations. Plaintiff reported that he would be receiving free insulin for a few months inasmuch as he agreed to participate in a study for diabetes. Plaintiff reported doing better now that he had his insulin and was scheduled to get anti-depressants. (Tr. 232.)

On October 24, 2005, a treatment plan was formalized for plaintiff by Dr. Ahmed and therapist DeGroot. It was determined that plaintiff would undergo medication management through Comtrea, engage in regular contact with his case manager, and have his medication monitored by a psychiatrist. Plaintiff's primary diagnosis remained major depression, recurrent, and his GAF was determined to be 50. (Tr. 238-40.)

Plaintiff returned to Comtrea on October 27, 2005, for counseling. Plaintiff reported to Ms. DeGroot that his mood was somewhat better with medication because it "took the edge off," but that he continued to have some level of depression. Plaintiff had

no suicidal or homicidal ideations. Plaintiff discussed his desire to obtain disability and the hardship of having no income. After discussion, an emergency plan was discussed in the event plaintiff's utilities were disconnected. Continued counseling was planned. (Tr. 230.)

On November 3, 2005, plaintiff reported to Ms. DeGroot that his medication was not working as well as he had hoped although he was sleeping better. Plaintiff had no suicidal or homicidal ideations. Plaintiff reported having exhausted all of his financial resources and that he would be seeking financial assistance from his mother and brother. Continued counseling was planned. (Tr. 229.)

Plaintiff visited Dr. Ahmed at Comtrea on November 9, 2005, and reported that he was not feeling any better with respect to his depression, although the pain in his leg had improved. Plaintiff reported that he mostly stays in his room at home and did not want to leave the house. Plaintiff reported that he has financial problems because he is unable to work and that he was still trying to get disability. Plaintiff reported that he sees his physician for his diabetes and would be able to get his related medication through her. Plaintiff reported not sleeping or eating well. Plaintiff's energy level was noted to be low. Memory and concentration were noted to be poor. Dr. Ahmed described plaintiff as being in moderate distress with his speech described as slow and monotone. Plaintiff's mood was low and his affect was restricted, stable and appropriate. Plaintiff had normal flow of thought with

no delusions or hallucinations. Plaintiff's insight and judgment were noted to be fair and his intellectual functioning was normal. Dr. Ahmed continued in his diagnosis of major depression, recurrent, and continued plaintiff on his current medication of Cymbalta. Seroquel was also prescribed for sleep. Dr. Ahmed encouraged plaintiff to seek financial aid, including Medicaid for himself and his son. Plaintiff was instructed to return in four weeks. (Tr. 215.)

On November 9, 2005, plaintiff forgot about a scheduled counseling appointment at Comtrea. The counseling appointment was rescheduled to November 17, 2005. (Tr. 228.)

On November 17, 2005, plaintiff called Comtrea and reported that he was unable to keep his scheduled counseling appointment because his car would not start. (Tr. 228.)

Plaintiff visited Dr. Ahmed on December 7, 2005, and reported that he was not sure whether he was improving. Plaintiff reported that his leg had been hurting and that the pain increases with weather change and cold at which time, plaintiff reported, he must use a cane. Dr. Ahmed noted plaintiff to be using a cane at the time of the appointment. Plaintiff reported that he was not doing well physically, although he felt his diabetes was under better control. Plaintiff reported feeling anxious a lot and that he continued to be isolated and withdrawn. Mental status examination reflected no change from the previous examination. Dr. Ahmed continued in his diagnosis of major depressive disorder, recurrent, and instructed plaintiff to increase his dosage of

Cymbalta.  Samples were given for three weeks.  Plaintiff was instructed to call Dr. Ahmed in two weeks and report on his condition, at which time Dr. Ahmed would consider an adjustment in medication, including adding Zoloft.  Plaintiff was also instructed to continue with Seroquel.  (Tr. 214.)

Plaintiff called Ms. DeGroot at Comtrea on December 8, 2005, and reported that his truck was not functioning and that he could not attend his counseling sessions until his transportation problems were resolved.  Plaintiff expressed concern regarding his financial situation and not having heat for the winter.  Plaintiff was given information regarding community resources to obtain assistance in paying for utilities.  Plaintiff was instructed to maintain contact with Comtrea every four to six weeks or as needed. (Tr. 227.)

On February 1, 2006, plaintiff failed to appear for a scheduled appointment at Comtrea.  (Tr. 221.)

On March 31, 2006, plaintiff visited Dr. Janet B. McGill at Washington University School of Medicine for multiple complaints.  Dr. McGill noted plaintiff to have poorly controlled type I diabetes, depression and peripheral vascular disease, and that plaintiff was being seen "for the first time in over 5 years." Plaintiff reported that he had been uninsured for most of that time and that he recently got Medicaid.  Dr. McGill noted plaintiff to have been using out of date insulin which he stockpiled a couple of years prior, and that plaintiff was unsure of his blood sugar levels because he had been unable to check them.  Dr. McGill noted

plaintiff to have a history of proliferative retinopathy but that he had not followed up on the condition for years. Dr. McGill also noted plaintiff to have proteinuria but that he had not had any testing nor taken any medication for the condition for several years. Dr. McGill noted plaintiff's creatin to have been normal the previous fall which she remarked to be "rather miraculous." Plaintiff reported tingling in his hands and that he cannot feel much in his feet. Plaintiff reported the numbness to nearly be to his knees. Plaintiff reported that he cannot walk from the office to the elevator without getting pain in his legs. Plaintiff reported the pain to be consistent with any walking. Plaintiff also reported that he received a rash from poison oak which caused lesions on his legs which have been slow to heal. Plaintiff reported having experienced pressure in his chest during the previous few months. Dr. McGill noted plaintiff's ongoing problem to be depression. Plaintiff reported that he had been "low" for years and was better when he was able to receive an anti-depressant. Plaintiff reported that he otherwise has difficulty getting through daily activities. Dr. McGill noted plaintiff's mood to be poor and that plaintiff did not have much motivation. Plaintiff reported that he is not able to enjoy much and is stressed by low income and caring for his twelve-year-old son. Plaintiff was noted not to be suicidal. Plaintiff reported having trouble with short term memory. Plaintiff reported having chronic back pain, which Dr. McGill opined may be related to congenital spondylolisthesis with segmentation defect at L2-3 and

lumbarization of the sacrum; also loss of height of T11-L3 with osteophytes present in the thoracic spine; and spina bifida occulta. Dr. McGill noted plaintiff to currently be taking the long-acting insulin Ultralente as well as the rapid-acting insulin Novolog. Plaintiff reported that he works intermittently doing landscaping or construction. (Tr. 182.)

Physical examination by Dr. McGill showed plaintiff to have 1+ edema of the lower extremities. No pulses were present in the feet. Radial pulses were 2+. Examination of the extremities showed no joint abnormalities. Mild contractures were noted at the hands. Plaintiff's deep tendon reflexes were measured to be 0 (zero). Sensation was greatly diminished to vibration, pin and monofilament testing. Upon conclusion of her examination, Dr. McGill diagnosed plaintiff with diabetes, chronically under poor control. Dr. McGill put in place a plan by which plaintiff was to monitor his blood sugar and report the results to Dr. McGill. Insulins Lantus and Novolog were prescribed. It was noted that "[t]his [was] only a starting point[.]" Plaintiff was also diagnosed with retinopathy and was instructed to make an appointment with Retina Consultants as soon as possible. Plaintiff was also diagnosed with nephropathy, for which he was instructed to start Cozaar.[9] With respect to plaintiff's neuropathy, Dr. McGill noted plaintiff's extremity pain to be an issue but that plaintiff

---

[9]Cozaar is used to treat high blood pressure and works by blocking the action of certain chemicals that tighten the blood vessels so blood flows more smoothly. Medline Plus (last revised July 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a695008.html>.

was "more interested in relief from depression" which is where Dr. McGill determined to start.  Dr. McGill also diagnosed plaintiff with peripheral vascular disease and instructed plaintiff to make an appointment with a vascular surgeon as soon as possible. Plaintiff[10] and aspirin were provided.  Plaintiff was instructed to schedule a stress thallium and cardiology follow up regarding his chest pain. With respect to plaintiff's depression, Dr. McGill determined to restart Zoloft since plaintiff responded to the medication in the past.  It was noted that plaintiff's previously prescribed Cymbalta helped with the extremity pain but did nothing for his depression.  Plaintiff was instructed to return to Dr. McGill in two months.  (Tr. 182-83.)

Plaintiff underwent bone density scans on March 31, 2006, at Washington University School of Medicine in response to complaints of pain in his back, neck, shoulder, arms, and legs. Bone density of the lumbar spine was near normal.  Bone density of the proximal left femur was 1.7 standard deviations below the mean for a man of plaintiff's age.  (Tr. 184.)

On April 14, 2006, plaintiff visited Dr. Brian G. Rubin upon referral from Dr. McGill for consultation relating to his peripheral vascular disease.  Dr. Rubin summarized plaintiff's medical history as related by Dr. McGill.  Dr. Rubin noted plaintiff to present now because of disabling claudication which

---

[10]Plavix is used to prevent strokes and heart attacks in patients at risk for these problems.  Medline Plus (last revised Mar. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601040.html>.

limited plaintiff's walking to one block.  Dr. Rubin noted that plaintiff's thighs, calves and buttocks were affected.  Physical examination showed easily palpable brachial and radial pulses. Femoral pulses were small but easily palpable and equal.  Pedal pulses could not be palpated.  No evidence of gangrene or ulceration was noted.  Dr. Rubin suspected that plaintiff had some component of occlusive disease which was contributing to his current complaints.  (Tr. 245-46.)  Treadmill testing performed that same date showed an ankle/arm index compatible with claudication on the right, but within normal limits on the left. (Tr. 248.)

MR angiography of the abdomen and lower extremities performed on May 1, 2006, showed high grade stenosis of the distal right superficial femoral artery, at the level of the adductor canal, with collateral formation; two vessel runoff of the right leg; moderate stenosis of the distal left superficial femoral artery with some collateral formation; and two vessel runoff within the left leg.  (Tr. 249-50.)

On May 17, 2006, plaintiff underwent a treadmill nuclear stress test in response to his complaints of chest pain and dyspnea.  Plaintiff exercised for over eleven minutes.  The test was terminated due to fatigue.  His performance was rated as "good" for a person his age and gender.  There was no ECG evidence of ischemia.  Myocardial imaging performed that same date reported normal results.  (Tr. 179-81.)

On June 9, 2006, plaintiff visited Dr. Khawla Khan, a

psychiatrist, at Comptrea.  Dr. Khan noted plaintiff to have been diagnosed with major depression, recurrent.  Plaintiff reported that the Cymbalta he had been prescribed was not working, and that his primary care physician changed his medication to Paxil[11] which he felt was working better for him.  Plaintiff reported a fifty-percent improvement in his depression.  It was also noted that plaintiff had diabetes from which he suffered complications and neuropathy in his legs.  It was also noted that plaintiff had poor circulation and was being prepared for surgery.  Dr. Khan noted plaintiff to be cooperative.  Plaintiff's mood was noted to be sad and his affect appropriate.  Plaintiff denied any suicidal thoughts.  Dr. Khan diagnosed plaintiff with major depression, recurrent, and assigned a GAF score of 60.  Dr. Khan determined to increase plaintiff's dosage of Paxil and instructed plaintiff to return in two weeks.  (Tr. 220.)

On July 28, 2006, plaintiff reported to Dr. Khan that he noticed very little improvement in his mood and was getting discouraged.  Plaintiff also reported concerns regarding his diabetes and, specifically, that his legs would be amputated because of poor circulation.  It was noted that plaintiff was sleeping well.  Dr. Khan noted plaintiff to be cooperative.  Plaintiff's mood was noted to be depressed and his affect appropriate.  Plaintiff denied any suicidal thoughts, delusions or hallucinations.  Dr. Khan continued in her diagnosis of major

---

[11]Paxil is indicated for the treatment of depression. Physicians' Desk Reference 3114-15 (55th ed. 2001)

depression, recurrent.  Plaintiff's dosage of Paxil was increased. Plaintiff was also instructed to see a therapist to cope with his chronic medical condition.  (Tr. 219.)

On August 10, 2006, Ms. DeGroot noted that plaintiff had been referred by Dr. Khan for therapy.  Ms. DeGroot called plaintiff and asked if he was interested in therapy and plaintiff agreed to come in the following week.  (Tr. 223.)

Plaintiff returned to Dr. McGill on August 15, 2006, who noted plaintiff's diagnoses to be poorly controlled type I diabetes, retinopathy, neuropathy, nephropathy, depression, and peripheral vascular disease.  Plaintiff continued to complain of tremendous difficulty walking due to pain in the extremities. Plaintiff reported that he can walk about one-quarter of a block before needing to stop and rest.  Dr. McGill noted plaintiff to be getting used to checking and adjusting his insulin.  Dr. McGill noted there to be evidence of frank nephropathy with preserved renal function.  Dr. McGill noted plaintiff to continue to experience very low mood from inactivity and inability to work. Plaintiff was not suicidal.  Dr. McGill noted plaintiff's current medications to include Lantus, Novolog, Cozaar, Zoloft, Paxil, and aspirin.  Plaintiff's range of symptoms had not changed since his last visit with Dr. McGill in March 2006.  Physical examination showed 1+ edema of the lower extremities.  No pulses were present in the feet.  Radial pulses were 2+.  Examination of the extremities showed no joint abnormalities.  Mild contractures were noted at the hands.  Plaintiff's deep tendon reflexes were measured

to be 0 (zero). Sensation was greatly diminished to vibration, pin and monofilament testing. Motor strength was noted to be reduced, but Dr. McGill observed that this may be normal for a small male. Upon conclusion of her examination, Dr. McGill diagnosed plaintiff with type I diabetes, improved, but continues to be sub-optimal; retinopathy, stable; nephropathy, for which he was instructed to add HCTZ for blood pressure control; and neuropathy, with extremity pain as an issue. Dr. McGill noted that plaintiff was "more interested in relief from depression[.]" Dr. McGill also diagnosed plaintiff with peripheral vascular disease and instructed plaintiff to keep regular appointments with a vascular specialist. Dr. McGill noted plaintiff's chest pain to continue but that no evidence of CAD was present by stress test. Finally, with respect to plaintiff's depression, Dr. McGill noted there not to be much change with Zoloft. Dr. McGill noted that a referral may be indicated, but that plaintiff was not interested. Plaintiff was instructed to return to Dr. McGill in two months. (Tr. 197-98.)

On August 17, 2006, plaintiff failed to appear for his scheduled therapy appointment with Ms. DeGroot. (Tr. 222.)

On August 25, 2006, plaintiff failed to appear for a scheduled appointment with Dr. Khan. (Tr. 219.)

On September 12, 2006, Dr. McGill completed a medical report for disability determinations wherein she noted plaintiff's diagnoses to be type I diabetes and peripheral vascular disease. Dr. McGill noted that plaintiff had very poor pulses, decreased sensation and could not walk greater than one block. Dr. McGill

noted that plaintiff needed ongoing dopplar examinations with a vascular specialist and opined that plaintiff had an incapacity/ disability which would be expected to have a duration of thirteen or more months. (Tr. 176-77.)

In a Medical Assessment of Ability to Do Work-Related Activities (Mental), completed September 22, 2006, Dr. Khan made the following findings: In the domain of Making Occupational Adjustments, that plaintiff had fair ability to relate to co-workers, deal with public, and interact with supervisors; and poor to no ability to follow work rules, use judgment, deal with work stresses, function independently, and be attentive/concentration. In the domain of Making Performance Adjustments, that plaintiff had fair ability to understand, remember and carry out simple job instructions; and poor to no ability to understand, remember and carry out complex or detailed job instructions. In the domain of Making Personal-Social Adjustments, that plaintiff had fair ability to maintain personal appearance; and poor to no ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. To support this assessment, Dr. Khan noted that plaintiff had not fully responded to anti-depressant treatment and that he suffered from depression and diabetes mellitus. Dr. Khan also noted that while she had personally seen plaintiff only twice, in June and July 2006, plaintiff had seen three psychiatrists at the facility. (Tr. 211.)

In a Physician's Assessment for Social Security Disability Claim, completed on November 3, 2006, Dr. McGill opined

that plaintiff was unable to do physical labor that involves standing, walking or lifting. Dr. McGill also noted that plaintiff's hand symptoms would make computer work a problem. Dr. McGill opined that plaintiff's endurance was affected by his impairments and that he would need to rest every ten minutes of an eight-hour workday. Finally, Dr. McGill opined that plaintiff would not be capable of sustained employment at the sedentary work level on account of the combination of his many medical problems and depression. (Tr. 196.)

In a letter dated November 17, 2006, to "To Whom It May Concern," Dr. Khan reported the following:

> I have seen this patient twice in my office: on June 9, 2006 and July 28, 2006.
>
> He suffers from Major Depression, Recurrent, treatment resistant and also has insulin dependent diabetes mellitus. He also suffers from complications of diabetes, and peripheral neuropathy, which causes difficulty in walking, weakness and ophthalmic changes. His disability is combined both mental and physical. He has not been able to work for over a year. He cannot concentrate or focus on the tasks necessary due to his emotional state. He is unable to work do [sic] to multiple physical problems. He cannot handle the stress of coming to work daily, or on time.

(Tr. 172.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act on November 1, 2003, and would continue to meet them through December 31, 2010. The ALJ found that plaintiff had not engaged in substantial gainful

activity since November 1, 2003. The ALJ found plaintiff's diabetes mellitus with neuropathy, major depressive disorder, and peripheral vascular disease to be severe impairments, but that such impairments did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations of disabling symptoms not to be credible. The ALJ found plaintiff to have the residual functional capacity (RFC) to lift twenty pounds occasionally and ten pounds frequently; push and pull with his legs with the same weight restrictions; sit, stand and/or walk six hours in an eight-hour workday; occasionally climb ramps and stairs; remember and carry out at least simple instructions on non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour period; respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; adapt to simple, routine work changes; and take appropriate precaution to avoid hazards. The ALJ found plaintiff not able to climb ladders, ropes or scaffolds; push and/or pull leg and arm controls and pedals; tolerate concentrated exposure to hazards, such as moving and dangerous machinery, and unprotected heights; and not able to repetitively push and pull with his arms. The ALJ determined that plaintiff could not perform his past relevant work as a casino dealer. Upon considering plaintiff's age, education, work experience, and RFC, the ALJ determined that plaintiff could perform other work in the national economy, such as simple cashiering jobs and inspection/packaging jobs. Accordingly, the

ALJ determined that plaintiff was not under a disability at any time through the date of the decision.  (Tr. 24-26.)

## V.  Due Process

As an initial matter, plaintiff claims that the Social Security Administration's adverse decision fails to comport with plaintiff's right to due process inasmuch as, in reaching his decision, the ALJ relied on evidence obtained post-hearing and did not provide plaintiff notice of such evidence or an opportunity to address it.  For the following reasons, plaintiff's argument is well taken.

The hearing before the ALJ took place in this cause on November 8, 2006.  On November 7, 2006, the day immediately preceding the hearing, the ALJ sent a letter to Dr. Khan asking whether there was "additional information readily available to clarify [Dr. Khan's] report/medical source statement[.]"  In this letter, the ALJ informed Dr. Khan that such information was requested because the previously submitted report appeared to contain conflicts that could not be reconciled with the medical evidence of record, including the other notes of record from Comtrea; did not contain all the necessary information needed to assess the severity of plaintiff's impairments; the basis for the opinion was unclear and the opinion appeared inconsistent with the plaintiff's prior work record; and it did not adequately address what the plaintiff could do in spite of his impairments.  The ALJ requested that Dr. Khan "provide medical records, a new report, or a more detailed report to support the source Statement." (Tr. 80.)

Neither plaintiff or his counsel were copied on this letter, nor was the letter a part of the record at the administrative hearing.[12] In addition, a review of the hearing transcript shows the ALJ not to have informed plaintiff or his counsel of this letter or its content.

In a letter dated November 17, 2006, addressed to "To Whom It May Concern" and received by the Office of Disability, Adjudication and Review on November 22, 2006, Dr. Khan set out her opinion as to the extent to which plaintiff was limited by his mental and physical impairments. (Tr. 172.)[13] Although made a part of the certified administrative record, this letter received by the SSA post-hearing was not provided to plaintiff or his counsel. In his written decision on January 20, 2007, the ALJ set out the contents of Dr. Khan's November 17, 2006, letter (Tr. 17) and relied on such contents, in part, to discredit Dr. Khan's opinion (Tr. 21). Plaintiff claims that the ALJ's failure to provide plaintiff notice of this post-hearing evidence and an opportunity to address such evidence prior to the ALJ's written decision constituted a denial of his right to due process. The undersigned agrees.

"The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual

---

[12]Exhibits B1 through 31 were admitted at the hearing and made a part of the record. (Tr. 29.) The letter to Dr. Khan is marked in the administrative record as B35. (Tr. 80.)

[13]The content of this letter is set out in its entirety supra at p. 28.

applying for a payment" of Federal Old-Age, Survivors, and Disability Insurance Benefits. 42 U.S.C. § 405(b)(1). Upon an unfavorable decision by the Commissioner and a request by the applicant, the Commissioner "shall give such applicant . . . reasonable notice and opportunity for a hearing with respect to such decision, and, if a hearing is held, shall, *on the basis of evidence adduced at the hearing*, affirm, modify, or reverse the Commissioner's findings of fact and such decision." Id. (emphasis added). A review of the Regulations as they relate to hearings before an ALJ, 20 C.F.R. §§ 404.929, et seq.; 416.1429, et seq., shows that the decisions of the ALJ are to be based on the hearing record, which includes existing evidence in the record, new evidence submitted at the hearing, testimony of the claimant, and testimony of any presented witnesses. 20 C.F.R. §§ 404.929, 416.1429. If the ALJ believes that there is material evidence missing at the hearing, he "may stop the hearing temporarily and continue it at a later date[.]" 20 C.F.R. §§ 404.944, 416.1444. "The administrative law judge may also reopen the hearing at any time before he or she mails a notice of the decision in order to receive new and material evidence." 20 C.F.R. §§ 404.944, 416.1444.

In the instant cause, the hearing record closed at the conclusion of the administrative hearing on November 8, 2006, and was never reopened.

In Coffin v. Shalala, 895 F.2d 1206 (8th Cir. 1990), upon the claimant's request, the ALJ held a hearing on August 20, 1986.

After the hearing, the ALJ sent written interrogatories to a vocational expert who was not present at the hearing. In the interrogatories, the ALJ described a hypothetical claimant and asked what type of jobs such a claimant could perform. The ALJ sent copies of the proposed interrogatories to the claimant's attorney and informed the attorney that the claimant had the right to object to the interrogatories or to propose his own questions. Claimant's attorney did not respond to this correspondence. Upon receipt of the vocational expert's answers to the interrogatories, the ALJ sent copies of the answers to claimant's attorney and gave the claimant the opportunity to offer comments or submit additional evidence. Claimant's attorney did not respond to this correspondence. On February 3, 1987, the ALJ entered his written decision denying claimant benefits, relying, in part, on the vocational expert's answers to the questions submitted to him post-hearing. Id. at 1209-10. In seeking judicial review of the adverse decision, the claimant argued that the ALJ's consideration of the post-hearing evidence violated his right to due process. The Eighth Circuit disagreed. Specifically, the Eighth Circuit determined that the ALJ's two letters to counsel which provided the claimant the opportunity to object to the post-hearing interrogatories, propose his own interrogatories, comment on the evidence provided by the expert, and submit additional evidence, satisfied due process. Id. at 1212. The Eighth Circuit distinguished the facts in Coffin from those in Townley v. Heckler, 748 F.2d 109 (8th Cir. 1984), wherein a due process violation was

found: "[I]n _Townley_, the appellant's attorney 'was not informed of the need for expert vocational evidence until after the report was filed with the ALJ. Further, appellant was denied an opportunity to examine that vocational report, and, despite claimant's request, no additional hearing was held.'" _Coffin_, 895 F.2d at 1211 (quoting _Townley_, 748 F.2d at 114).

In this cause, unlike the circumstances in _Coffin_ and similar to those in _Townley_, the ALJ sought post-hearing evidence but failed to provide notice to the plaintiff or his counsel that he was doing so, and failed to provide notice of the evidence received. Nor did the ALJ provide any indication to plaintiff or counsel that he considered Dr. Khan's September 2006 assessment insufficient and requested post-hearing evidence relating thereto. This is especially troubling here given that this apparently insufficient assessment provided the basis for the ALJ's second hypothetical question posed to the vocational expert at the hearing, with no explanation provided to plaintiff or his counsel that the ALJ in fact and at that time considered such assessment incomplete and/or insufficient.

As noted in _Coffin_, the practice of allowing post-hearing reports is not uncommon. "The ALJ will frequently not close the record after the hearing either to order a post-hearing examination of the claimant or to allow the claimant to introduce post-hearing evidence in support of his claim." _Coffin_, 895 F.2d at 1211. As noted above, however, the record here was closed and the ALJ sought and obtained post-hearing evidence without providing any notice to

plaintiff until the written adverse decision. In the absence of any notice to plaintiff of this post-hearing evidence upon which the ALJ relied, in part, to deny plaintiff benefits, it cannot be said that due process requirements were satisfied here.[14]

## VI. Substantial Evidence

Plaintiff also claims that, regardless of the due process violation as discussed above, the Commissioner's decision on the underlying merits of plaintiff's applications for benefits is not supported by substantial evidence on the record as a whole and must be reversed and the case remanded for an award of benefits or for a new hearing. For the following reasons, these alternative claims must fail.

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§

---

[14]As has the Eighth Circuit, the undersigned assumes for purposes of this discussion that due process applies without determining whether plaintiff has a property interest in the social security benefits. <u>See</u> <u>Passmore v. Astrue</u>, No. 07-3078, slip op. at 8-9 n.4 (8th Cir. July 9, 2008) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401-02 (1971); <u>Hepp v. Astrue</u>, 511 F.3d 798, 804 n.5 (8th Cir. 2008)).

423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes

entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent

conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff contends the ALJ's decision is not supported by substantial evidence on the record as a whole inasmuch as the ALJ ignored all of the physicians' opinions regarding plaintiff's RFC and thereby determined plaintiff's RFC without support of any medical evidence of record. Plaintiff also contends that the ALJ erred by relying on the testimony of the vocational expert in finding plaintiff able to perform the jobs of cashier and inspector/hand packager inasmuch as the vocational factors for such jobs as set out in the Dictionary of Occupational Titles are inconsistent with the hypothetical upon which the expert's testimony was based. The Court will address each of these contentions in turn.

A. Medical Evidence of RFC

Plaintiff contends that the ALJ ignored Drs. Emmons', McGill's and Khan's opinions as to plaintiff's ability to function in the workplace and that without such opinions, the record is devoid of any medical evidence of such ability. Plaintiff therefore argues that the ALJ's RFC determination is not supported

by any medical evidence in the record and thus cannot stand.[15]  For the following reasons, plaintiff's argument is without merit.

Residual functional capacity is what a claimant can do despite his limitations.  <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001).  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002).  The ALJ is required to consider at least some supporting evidence from a medical professional and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace.  <u>Id.</u>  An ALJ's RFC determination which is not properly informed and supported by some medical evidence in the record cannot stand.  <u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (8th Cir. 2001).

In his written decision, the ALJ considered all the medical evidence of record, including the assessments of Drs.

---

[15]Plaintiff does not claim that the ALJ *improperly* discounted these assessments by Drs. McGill, Khan and Emmons; only that without such assessments, there is no medical evidence upon which the ALJ could base his RFC determination.  Although plaintiff vaguely suggests in a footnote that the ALJ may have discounted "some" opinions and records from "various" doctors "not necessarily on legally sufficient grounds" (Pltf.'s Brief at p.18, n.7), this vague reference in a footnote is insufficient to bring a specific claim before the Court.

Emmons, McGill and Khan, and determined that plaintiff had the RFC to lift twenty pounds occasionally and ten pounds frequently; push and pull with his legs with the same weight restrictions; sit, stand and/or walk six hours in an eight-hour workday; occasionally climb ramps and stairs; remember and carry out at least simple instructions on non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour period; respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others was casual and infrequent; adapt to simple, routine work changes; and take appropriate precaution to avoid hazards. The ALJ found plaintiff not able to climb ladders, ropes or scaffolds; push and/or pull leg and arm controls and pedals; tolerate concentrated exposure to hazards, such as moving and dangerous machinery, and unprotected heights; and not able to repetitively push and pull with his arms. Contrary to plaintiff's assertion, a review of the record as a whole shows there to be some medical evidence from a medical professional to support the ALJ's determination.

First, treatment notes from Dr. Gross in April 2004, two months subsequent to plaintiff's shoulder surgery, show plaintiff to have had 4/5 motor strength of the right shoulder with improved range of motion. Objective findings from Dr. Emmons' June 2005 examination show that despite decrease in sensation, plaintiff's grip strength and upper and lower extremity strength were measured to be 5/5 bilaterally. Range of motion about the left shoulder as well as the wrists, knees, hips, and ankles was normal; and

plaintiff's gait was normal. During his stress test in May 2006, plaintiff exercised in excess of eleven minutes and performed at a "good" level. The test was terminated only because of fatigue. In her treatment notes of August 2006, Dr. McGill noted plaintiff's motor strength to be reduced, but observed that that may be "normal" for a small male, such as plaintiff. To the extent plaintiff experienced pain from his neuropathy, he requested both in March 2006 and August 2006 that his depression be treated first and thus no pain relief was offered or provided. With respect to plaintiff's mental abilities, treatment notes from Comtrea show plaintiff's intellectual functioning to have been consistently observed as normal. Plaintiff's depression was also noted to improve when he took medication. In June 2006, plaintiff received a GAF score of 60 from his treating psychiatrist, which indicated moderate symptoms. See Goff, 421 F.3d at 791 (treating psychiatrist's GAF score of 60, indicating moderate symptoms, is inconsistent with assessment indicating significant limitations). In her September 2006 assessment, which plaintiff contends the ALJ ignored, Dr. Khan indicated that plaintiff had fair ability to relate to co-workers, deal with public, and interact with supervisors; fair ability to understand, remember and carry out simple job instructions; and fair ability to maintain personal appearance. The assessment defined "fair" as "[a]bility to function in this area is seriously limited, but not precluded." (Tr. 211.)

        In light of the above, it cannot be said that the ALJ's

RFC determination was not based on some medical evidence. A reading of the ALJ's decision shows him to have conducted an independent and thorough review of *all* the medical evidence of record, including the assessments of Drs. Emmons, McGill and Khan. Nevertheless, even in the absence of such assessments, there existed other medical evidence in the record to support the ALJ's RFC determination, as set out above. In finding plaintiff capable of performing work-related functions, the ALJ here considered the medical records, the opinions of plaintiff's treating and consulting physicians, and plaintiff's own description of his limitations. Substantial evidence on the record as a whole supports this determination. <u>Krogmeier</u>, 294 F.3d at 1024.

B. <u>Vocational Expert Testimony</u>

Finally, plaintiff contends that the ALJ erred by relying on the testimony of the vocational expert in finding plaintiff able to perform the jobs of cashier and inspector/hand packager inasmuch as the vocational factors for such jobs, as set out in the Dictionary of Occupational Titles, are inconsistent with the hypothetical upon which the expert's testimony was based.

In response to the ALJ's first hypothetical at the administrative hearing, which included <u>inter</u> <u>alia</u>, that the claimant was limited to casual and infrequent contact with others and limited to no repetitive pushing or pulling with arms or legs bilaterally, the vocational expert testified that such a person could perform the work of cashier-II and inspection/hand packaging jobs. At the hearing, the vocational expert specified code numbers

211.462-010 and 559.687-074, respectively, as the corresponding categories of such jobs as set out in the Dictionary of Occupational Titles. (Tr. 45.) Plaintiff's counsel then asked the expert if such jobs "would be upper bilateral manual dexterity intensive kind of work[.]" (Tr. 46.) The expert responded:

> The upper extremities are obviously involved. The aptitude isn't required to be high for those. A low average aptitude is certainly sufficient and they -- and the numbers of jobs I've cited, my opinion is that there's not a continual aspect of upper extremity use. It's less than -- it's either frequent or less than frequent in my opinion.

(Tr. 46.)

Plaintiff now claims that because the vocational factors for cashier-II under DOT classification number 211.462-010 include frequent contact with people; and include repetitive arm movements for inspection/hand packaging jobs under DOT classification number 559.687-074, the vocational expert testified to jobs that plaintiff could NOT perform with his specific limitations, and thus the ALJ erred in relying on such testimony to find plaintiff able to perform such other work.

With respect to inspector/hand packaging jobs, the DOT shows such work to include performing repetitive or short-cycle work and frequent reaching, handling, fingering, and significant handling of things. DICOT 559.687-074, 1991 WL 683797 (4th ed. 1991). As noted by the Eighth Circuit, however, "DOT definitions are simply generic jobs descriptions that offer the approximate *maximum* requirements for each position, rather than their range."

Page v. Astrue, 484 F.3d 1040, 1045 (8th Cir. 2007) (internal quotation marks and citation omitted) (emphasis added). Where, as here, a vocational expert specifically limits his testimony to the facts of the hypothetical posed to him, the ALJ may properly rely on the expert's testimony that the claimant can perform such work with the specific limitations. Id.; Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995). Here, because the vocational expert specifically opined that there continued to exist a significant number of inspector/hand packaging jobs that plaintiff could perform even with the specific limitation that plaintiff could engage in no repetitive work with the upper extremities, the ALJ did not err in relying on this testimony in finding plaintiff able to perform other work as it exists in the national economy. Page, 484 F.3d at 1045; see also Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (650 jobs in state and 30,000 jobs in the nation constitute a significant number of jobs).[16]

When based upon a properly phrased hypothetical question, the testimony of a vocational expert constitutes substantial evidence upon which the ALJ may base his decision. Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007); Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996). The ALJ here posed a hypothetical question to the vocational expert which captured the consequences of

---

[16]Inasmuch as the ALJ's finding that plaintiff could perform a significant number of inspection/hand packaging jobs was supported by substantial evidence on the record as a whole, the Court need not address plaintiff's claim that the ALJ erred in relying on the expert's testimony as it relates to the job of cashier-II.

plaintiff's deficiencies, and the vocational expert properly limited his testimony to the specific restrictions imposed upon plaintiff as set out in the hypothetical. Accordingly, the ALJ's decision that plaintiff could perform other work in the national economy as testified to by the vocational expert was supported by substantial evidence on the record as a whole. <u>Cox</u>, 495 F.3d at 621; <u>Pickney</u>, 96 F.3d at 296.

## VII.  Conclusion

For the foregoing reasons, on the evidence before the ALJ at the time he entered his written decision, it cannot be said that the decision to deny plaintiff benefits was not based upon substantial evidence on the record as a whole. However, given the ALJ's failure to provide notice to plaintiff of post-hearing evidence upon which the ALJ relied, in part, to deny plaintiff's applications for benefits, it cannot be said that the ALJ fully and fairly developed the relevant evidence on plaintiff's claim. <u>See</u> <u>Oyen v. Shalala</u>, 865 F. Supp. 497, 509-10 (N.D. Ill. 1994). Accordingly, remand is required to provide plaintiff the opportunity to address the post-hearing medical report obtained by the ALJ. <u>Id.</u> The undersigned notes, however, that such opportunity does not encompass an absolute right to subpoena and/or cross-examine the author of said report. <u>Passmore</u>, No. 07-3078, slip op. (8th Cir. July 9, 2008).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the

Commissioner be reversed and that this matter be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **August 4, 2008,** Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_____
UNITED STATES MAGISTRATE JUDGE


Dated this  _22nd_  day of July, 2008.